**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| GPS International Technologies, Inc., | ) | Case No.    **24-cv-7758** |
| Plaintiff, | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| Verizon Communications Inc., Cellco Partnership d/b/a Verizon Wireless, Catherine Bennett and Does 1-25, inclusive, | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff GPS International Technologies, Inc. ("GPSI" or "Plaintiff"), for its Complaint against Verizon Communications, Inc. ("Verizon Communications"), Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless") (Verizon Communications and Verizon Wiress referred to herein, individually and collectively, as "Verizon" or the "Verizon Defendants"), Catherine Bennett ("Bennett") and Does 1-25, inclusive (individually and collectively, "Defendants") alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference with contract, tortious interference with prospective business relations, fraudulent inducement, negligent misrepresentation and unjust enrichment.

2.      Plaintiff GPSI was established in or around November 2005 to provide reliable, low-cost asset tracking solutions using state-of-the-art, long-battery-life wireless Global Positioning System ("GPS") trackers paired with GPSI's cloud-based TrackFusion application, a

software platform that enables GPSI's customers to track and manage the GPSI tracking devices. For example, GPSI customers can use TrackFusion to know the real-time location of all of their tracked assets and, in some versions, to monitor high-value, high-risk and/or perishable items such as food, pharmaceuticals, manufactured goods, high-end electronics, jewelry, and even assist law enforcement to track criminals including pedophiles, suspects and the subjects of police sting operations.

3.     In addition to tracking real-time location, some versions of GPSI's trackers can also monitor temperature, humidity, ultraviolet ("UV") light, opening and closing of vehicle or container doors, and acceleration (for example for drop detection).  Versions of GPSI's trackers are both battery-operated and "energy harvesting" (e.g. solar) enabled.  GPSI specializes in tracking trailers, containers, goods in transit and other high-value assets.  GPSI has earned an outstanding reputation as a trusted leader serving governments and businesses, ranging from small organizations to major commercial enterprises and law enforcement and other government agencies.

4.     Plaintiff is informed and believes that each of the Defendants is responsible in some manner, either by act or omission, strict liability, fraud, negligence, breach of contract, breach of express/implied warranty, negligence per se, res ipsa loquitor, respondeat superior, employment, agency, breach of statute, joint tortfeasor, or otherwise, for the occurrences alleged herein, and that Plaintiff's damages were proximately and legally caused by the conduct of the defendants.

5.     Plaintiff is informed and believes and thereon alleges, that at all times herein mentioned, each of these Defendants, including Defendants sued under fictitious names, was the agent, employee, alias and/or alter ego of some or all of the remaining Defendants, and in doing

the things herein alleged, was acting within the course and scope of such agency, alias, alter ego and/or employment, and with the actual knowledge, consent and approval of some or all of the other Defendants.  Each Defendant's conduct was specifically ratified and approved by some or all of the other Defendants.

## PARTIES, PRINCIPALS AND AFFILIATES

6.      At all times alleged herein, Plaintiff GPSI was a corporation organized and existing under the under the laws of the State of California and is duly licensed and authorized to conduct business under the laws of the State of California.

7.      At all times alleged herein, Netzer Ruperto ("Mr. Ruperto") was and is a resident of San Diego County, California.  At all times alleged herein, Mr. Ruperto was doing business in California as a founder and owner of GPSI.

8.      Plaintiff has been informed and believes and thereon alleges that at all times alleged herein, the official addresses of the headquarters and the Board of Directors of defendant Verizon Communications, Inc. have been located in New York, NY, with a headquarters address at 1095 Avenue of the Americas, New York, NY 10036.

9.      Plaintiff has been informed and believes and thereon alleges that at all times alleged herein, defendant Cellco Partnership d/b/a Verizon Wireless has been a wholly-owned or majority-owned subsidiary of Verizon Communications and has been a Delaware Partnership with its principal place of business in Basking Ridge, New Jersey.

10.      Plaintiff has been informed and believes and thereon alleges that at all times alleged herein, defendant Catherine Bennett ("Defendant" or "Bennett") has resided in Tulsa, Oklahoma and is an individual, employed by Verizon.  At all times alleged herein, defendant Bennett has been acting within the course and scope of her employment with Verizon.  At all

3

times alleged herein, defendant Bennett has been a collections supervisor for Verizon and has

been responsible for collecting money allegedly owed to Verizon by Plaintiff GPSI.

11.    Defendants Does 1 through 25, inclusive, are sued herein under fictitious names.

Their true names and capacities are currently unknown to Plaintiff.  When their true names and

capacities are ascertained, Plaintiff will amend this Complaint by inserting their true names and

capacities.  Plaintiff is informed and believes and thereon alleges that each of the fictitiously

named defendants is responsible in some manner for the occurrence herein alleged, and that

Plaintiff's damages were proximately and legally caused by those defendants.  Each reference in

this Complaint to "Defendant," "Defendants," or specifically named defendants refers to all

named defendants and those sued under fictitious names.

## JURISDICTION AND VENUE

12.    This Court has general jurisdiction over each of the Defendants because each is a

domiciliary of, has business operations headquartered in, transacts a significant amount of

business in, and otherwise maintains continuous and systematic contacts as to render each of

them residents of the State of New York for the purposes of jurisdiction.

13.    This Court has specific jurisdiction over the corporate Defendants because each is

a domiciliary of and/or has business operations headquartered in and/or transacts a significant

amount of business in, New York, New York.

14.    This action arises under the statutory and common laws of the State of New York.

15.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because it is a

claim for over $75,000, and on information and belief, there is a diversity of citizenship because

Plaintiff is a citizen of California, and none of Defendants are citizens of California.  On

information and belief, the Verizon Defendants are citizens of New York and New Jersey, and

Bennett is, on information and belief, a citizen of Oklahoma.

16.     This Court has specific jurisdiction over the Defendants because each is a

domiciliary of or has business operations headquartered in and transacts a significant amount of

business in, New York, New York.

17.     The contract between the parties provides: "Each Party submits to personal

jurisdiction exclusively in New York, New York, and waives all objections to a New York

venue."

18.     Venue is also proper pursuant to 28 U.S.C. § 1391(b) because all Defendants are

residents of the State of New York, for the purposes of jurisdiction, and one or more of the

Defendants resides in this District, and because a substantial part of the events giving rise to the

claims occurred in this District.

## GENERAL FACTS RELEVANT TO PLAINTIFF'S CAUSES OF ACTION

**A.     2005-2010: GPSI Pioneers the Wireless Fleet Tracking Industry and Earns
Accolades from Customers in the Private and Public Sectors**

19.     Plaintiff hereby incorporates by reference paragraphs 1 through 18 as though fully

set forth herein.

20.     GPSI developed cutting edge technology for wireless trackers with integrated,

internal GPS and cellular antennas ("Integrated Wireless Trackers" or "IWTs"), along with

control and monitoring software, starting in or around November 1, 2005.  On information and

belief, GPSI was the first company to market such Integrated Wireless Trackers in the United

States.  It was not until years after GPSI pioneered the field of IWTs that far larger logistics

companies like Federal Express adopted IWTs for the tracking of goods.

21.     In or about April of 2006, GPSI became the first company in the U.S. to offer wireless GPS tracking through Qualcomm's SNAP TRACK technology.  This innovation allowed GPS triangulation even when a device was impaired, setting a new standard in the market with a compact, wireless tracker.  GPSI's clients included law enforcement agencies who used the technology to covertly track criminals, suspects and those people on parole.

22.     GPSI's innovative technology played a pivotal role in numerous successful investigations and arrests, earning the recognition and trust of local, state and federal law enforcement agencies. For example, in or around April 2007, GPSI was invited to the Law Enforcement Expo held in New York City. At the event, GPSI was recognized by high-ranking officers in the U.S. Drug Enforcement Agency ("DEA") for GPSI's accomplishments and contributions to law enforcement in apprehending criminals including drug traffickers.  At the Law Enforcement Expo, GPSI was presented with the event's Innovation Award, recognizing GPSI's ground-breaking achievements in its development of outstanding and innovative products, services and solutions.

23.     One example of GPSI's successful collaboration with law enforcement authorities occurred during a highly-publicized case in 2010, when a teenage girl in San Diego named Chelsea King was kidnapped during a walk around a lake near her house and was, sadly, found dead.  GPSI worked with the police to place numerous GPSI trackers on the suspect's car, as well as the vehicles of his friends, associates and relatives.  The data collected from the GPSI trackers enabled law enforcement to determine the locations frequented by the suspect and his associates, ultimately generating sufficient evidence to arrest the suspect and convict him.

24.     In addition to the recognition GPSI was receiving from the public sector, GPSI's early successes began to attract the attention of large companies in the wireless technology field,

such as Kyocera Wireless Corporation.  GPSI launched a partnership with Kyocera in April of 2008. The collaboration with Kyocera significantly enhanced GPSI's ability to expand into the business of tracking package goods for major manufacturers and distributors, leveraging Kyocera's market presence and technology.

25.     GPSI continued to grow, securing contracts with major retailers throughout 2008 and beyond.  For example, GPSI entered into agreements with Target, Walmart and USPS, which marked major advances in both GPSI's growth and its outstanding reputation among "blue chip" companies.  These partnerships and deals with other large companies significantly expanded GPSI's presence in the retail and logistics sectors.

26.     Over time, GPSI's technology became essential to its customers' loss prevention operations by significantly enhancing their tracking and surveillance capabilities.  For example, by placing GPSI's device into boxes with pallets of inventory, GPSI customers could wirelessly track shipment from origin to destination.  If the shipment deviated from its route, or if inventory was removed from the pallet, GPSI would be alerted, notifying the customer in turn.  Thus, GPSI's combination tracking devices and proprietary software drastically reduced instances of lost or stolen shipments, helping clients mitigate risks, improve overall security within their supply chains and increase their bottom-line financial results.

**B.     2011-2016: Verizon Courts GPSI to Become a Strategic Business Partner to Grow the Integrated Wireless Tracking Business**

27.     In GPSI's first few years of operation, it had a telemetry and data partnership with Sprint.  GPSI's activations in those years were hosted on Sprint's wireless network.  GPSI had initially partnered with Sprint because it was one of the first carriers to enable "E911", a GPS triangulation technology that GPSI relied on for tracking devices that were not in a direct "line of

sight" to GPS satellites. Sprint's early adoption of this technology, along with other Sprint support for its business partners, helped GPSI bring its products and services to market quickly.

28.    In December of 2011, Verizon approached GPSI with a proposal to move GPSI's wireless tracking systems to Defendants' wireless network, a move which would require GPSI's devices to be customized to operate within Verizon's infrastructure.  To lure GPSI away from Sprint, Verizon's proposal included the incentive of adding GPSI to Verizon's new Partner Program.  The Partner Program would give GPSI marketing access to approximately 1,500 Verizon sales representatives all over the nation, jointly selling GPSI's products and services. Verizon's offer included additional enticements, such as lower data costs.  Verizon also benefitted from the partnership, as the company had no Integrated Wireless Tracker solution of its own. Verizon was eager to tout GPSI's solutions to its customer base.  This partnership with Verizon offered tremendous growth potential for GPSI, but also had the effect of making GPSI highly dependent on Verizon's network.

29.    In order to move forward with the Verizon Partner Program, GPSI was required to undergo a rigorous device testing and certification process to ensure that its devices would operate seamlessly on Verizon's network.  This process involved substantial time and monetary investment on GPSI's part.  The testing phase, which lasted approximately six months, included two weeks where GPSI worked onsite at Verizon's facilities.  This certification was mandated by Verizon to ensure that GPS's trackers complied with Verizon's operational and technical requirements.

30.    During this extensive testing and certification process, GPSI was not able to pursue business with other companies, and full-time focus on the certification process resulted in a significant financial investment.  The estimated cost for this phase amounted to

approximately $150,000 in operational expenses.  Operationally, transitioning GPSI's devices to Verizon's network required reprogramming the devices.  Since the devices were hard-coded for specific networks at the time, switching from Sprint to Verizon involved physically connecting each device to a computer for reprogramming.  This made switching back to another vendor a highly impractical and costly endeavor once the devices were configured for Verizon.

31.     On or about June 20, 2013, following the successful completion of the testing and certification process, GPSI and Verizon entered into a Verizon Wireless Vertical Solution Provider M2M Agreement (the "Agreement").  According to the Agreement, GPSI became a Vertical Solution Provider ("VSP") to Verizon, whereby GPSI provided the wireless hardware to customers and Verizon provided the cellular lines to those customers.  The agreement stated that Defendant Verizon would provide a minimum of 20,000 Machine to Machine ("M2M") lines to GPSI.  In exchange, GPSI would pay for usage of those lines.  The term for each M2M line was a period of one or two years. Thereafter, service continued on a monthly basis.  If an M2M line was terminated before the term expired, an Early Termination Fee ("ETF") of $50.00 could be applied.  If an M2M line was terminated after the term expired (*i.e.*, in the month-to-month phase), no ETF could be applied.  This agreement laid the groundwork for further collaboration, leading to a major partnership milestone just two months later.

32.     On or about August 22, 2013, Verizon announced that GPSI had been approved to join the new Verizon Partner Program. This program was established to jointly market complementary solutions to prospective customers, offering tremendous growth potential for both Verizon and GPSI in the IWT market.  Through this initiative, GPSI would benefit from Verizon's vast network and sales resources, creating opportunities to reach a larger market while enhancing Verizon's portfolio of services.

33.     In its business partnership with Verizon, GPSI invested substantial time, effort and expense training Verizon's sales representatives how to sell GPSI's wireless tracking products.  This training was crucial in enabling Verizon's sales force to understand GPSI's solutions and communicate their benefits to prospective customers.  When Verizon's sales representatives identified potential clients, they would refer them to GPSI for further discussions.  Then, GPSI would present the service solution to the prospective customer.  Once the customer signed up with GPSI and paid for the wireless lines and the hardware, GPSI paid Verizon for service to the lines that were sold.  If GPSI signed up a customer through this marketing channel, the customer was contractually obligated to maintain wireless service with Verizon for a minimum of three years.  If a GPSI customer canceled the service before the end of the contract, GPSI was still financially responsible to Verizon for the cost of the lines, creating a significant risk for GPSI.  This exclusivity benefited both parties—ensuring GPSI's hardware was consistently paired with Verizon's services and locking customers into long-term commitments through GPSI.

34.     The business model established by the Agreement and the Verizon Partner Program relied on close cooperation between the two companies, with GPSI handling product delivery and customer relationships, while Verizon provided additional customer lead generation, as well as the back-end wireless service that both GPSI and its customers became heavily reliant upon.

35.     The collaboration between GPSI and Verizon focused on providing specialized wireless tracking solutions for industries that had time-sensitive requirements, such as trucking, food logistics, pharmaceuticals, and specific use cases like public school bus tracking and organ

transplant tracking. These industries relied heavily on precise, real-time tracking, which GPSI, through its partnership with Verizon, was able to deliver efficiently.

36.    As part of its commitment to the partnership, GPSI shifted the majority of its customers' wireless lines from Sprint to Verizon to demonstrate GPSI's dedication and loyalty to Verizon as an essential business partner.  This move not only solidified the collaboration but also resulted in substantial revenue for Verizon due to the migration of GPSI's customer base to Verizon's network.

37.    GPSI's customer base was diverse, spanning various industries that relied on its cutting-edge tracking technology.  Some of these customers included Delaware Valley Lift Truck Inc., 1-800-GOT-JUNK?, William Jones & Son Inc., Donley Trucking Inc., Iroquois Memorial Hospital, GT Fleet LLC, Wolfman Rentals LLC, Alabama Motor Express Inc., Treehouse Foods Inc., and many others.  These companies represented many business sectors including logistics, transportation, construction, food services, and more, all of which benefited from GPSI's ability to provide real-time tracking solutions backed by Verizon's network.

38.    GPSI's participation in the Verizon Partner Program was mutually profitable and spanned approximately four years, from 2013 to 2017.

39.    During this time, GPSI experienced substantial growth, with its customer base nearly doubling. This growth was driven by the co-selling arrangement with Verizon's sales representatives, who actively promoted GPSI's technology to their customer networks.  As a result, by 2017, virtually all of GPSI's customers were also Verizon customers, further solidifying the partnership and Verizon's dominance as the preferred network for GPSI's solutions.

40.     The partnership's success over this four-year period set the stage for GPSI to become a prominent player in the machine-to-machine (M2M) and Internet of Things (IoT) space, driving innovation and growth in asset tracking solutions.

**C.     2016-2017: Verizon Purchases Competing Businesses and Drops GPSI from its Partner Program**

41.     In or around 2016, Verizon acquired a company called Fleetmatics for $2.4 billion, enhancing Verizon's fleet management and vehicle tracking capabilities.  On information and belief, the Fleetmatics acquisition positioned Verizon to compete directly in the GPS tracking market, reducing Verizon's need for external partners like GPSI.  Additionally, in or around 2016, Verizon purchased Telogis, a fleet management company that offered software solutions for logistics and vehicle tracking.  Telogis' services included routing, compliance, and navigation software, again positioning Verizon as a direct competitor to GPSI.

42.     As a result of these acquisitions, Verizon no longer needed GPSI's solutions. In February 2017, despite the parties' previously successful partnership, Verizon abruptly removed GPSI from its Partner Program, leaving GPSI in a precarious position.  GPSI had heavily relied on Verizon's extensive sales network of 1,500 sales representatives, who co-sold GPSI's tracking products to customers.  Without Verizon's sales network, GPSI had no choice but to rely solely on its existing customer base and GPSI's internal sales and marketing efforts. While GPSI sought new partnerships and alternative marketing channels to fill the gap left by Verizon, this transition was incredibly challenging without the extensive resources and support Verizon had provided as part of the Partner Program.

43.     Despite these challenges, almost entirely due to Verizon's abandonment of its business partnership with GPSI, GPSI managed to stay operational by cutting costs, streamlining

operations, and focusing on smaller, niche markets where their tracking solutions could still hold value. However, the abrupt loss of marketing support made it difficult for GPSI to regain the same level of growth and stability it had once enjoyed.

44.     From 2017 onwards, although the Verizon Partner Program ("VPP") was no longer in effect, the original agreement between Verizon and GPSI remained in place. Despite the abrupt end of the VPP partnership, GPSI remained loyal to Verizon and continued to activate its customers wireless lines on Verizon's network.

**D.     2017-2019: Verizon Transitions to 4G and 5G Networks and Imposes Cost Burdens onto GPSI to Adapt to the New Technology**

45.     From 2017 to 2019, with Verizon playing a key role, the wireless industry underwent a significant transition from 2G and 3G networks (also called "CDMA") to 4G (also called "LTE") and 5G technology. This shift was driven by the perceived need for faster data speeds and the ability to support more devices on wireless networks.

46.     On or about March 9, 2018, Verizon sent GPSI a notice that Verizon planned to terminate service and "sunset [Verizon's] CDMA network" December 31, 2019. The notice stated "[a]fter June 30, 2018, Verizon will stop activating new CDMA equipment." Verizon further stated that they would only support certain account services until July 1, 2019. Thus, GPSI was required to upgrade its customers' hardware to be compatible with the newer 4G LTE and 5G networks by the end of 2019.

47.     By way of background, CDMA is a type of wireless network technology used for 2G and 3G networks. It was widely used by carriers like Verizon for voice and data transmission over the past several decades. However, Verizon's announcement meant that GPSI's CDMA devices, which relied on Verizon's CDMA network, would no longer be supported.

48.    For GPSI, this technology transition required a considerable investment in both time and money, none of which Verizon assisted with, despite the companies' many years of working together to grow the Integrated Wireless Tracking business.  The shift from 4G to 5G required significant technological upgrades, adding further financial strain on GPSI at a time when it had lost the support of Verizon's marketing and sales resources.

49.    Verizon required all of GPSI customers' CDMA devices to be replaced with new hardware that supported LTE.  An example of the impact of this change can be seen with a GPSI customer who had 50 lines running on CDMA.  GPSI had to provide the customer with 50 new LTE-compatible devices, effectively doubling the customer's lines in terms of cost.  However, Verizon falsely stated that the original 50 CDMA lines were still under the contracted term, and demanded that GPSI continue to pay Verizon for the old CDMA lines — despite the fact that Verizon had already declared them obsolete and abandoned support for them.

50.    In spite of these financial and operational burdens, GPSI demonstrated loyalty as a business partner to Verizon by jumping through all the supposedly necessary "hoops" in order to implement these Verizon-mandated changes.  GPSI continued to activate lines on Verizon's network and ensured their customers' hardware met the new requirements imposed by Verizon. This effort showed GPSI's dedication to maintaining its long-term business relationship with Verizon, even though it meant incurring additional costs and managing the complex logistics of upgrading hardware for their customers activations — all at GPSI's expense and with little to no logistical or financial support from Verizon.

**E.    2018-2021: Verizon Abandons Support for GPSI's CDMA Lines and Begins Charging Fraudulent "Early Termination Fees" to GPSI for Shutting Off the Now-Redundant and Obsolete Lines**

51.    While Verizon forced GPSI to transition to newer hardware, Verizon provided no instructions or procedures to assist in this massive transition effort.  This left GPSI alone to manage the difficult, time-consuming, and expensive process.  As the deadline for switching to LTE loomed, GPSI began swapping out CDMA devices for LTE devices across its customer base.  This transition imposed additional costs, including new hardware and installation fees, as well as substantial time to switch over the hardware.

52.    This unavoidable transitioning of lines led to "double-line" issues where old CDMA lines remained technically active (though unused) alongside the newly-activated LTE lines.  This caused significant confusion and inflated costs for GPSI and its customers.

53.    In or about March 2021, GPSI deactivated the old CDMA lines — "ghost lines" — that were no longer in use and no longer supported by Verizon, though as GPSI learned later, the ghost lines continued to be tracked in Verizon's billing system.

54.    When GPSI deactivated the "ghost lines", which were at least 3-5 years old (and therefore well outside their contractual term), Verizon charged GPSI's account Early Termination Fees ("ETFs") of approximately $30,000.00.  According to the contract between Verizon and GPSI, the term for each line was a period of one or two years.  If, and only if, the line was terminated before the term expired, an ETF of would be applied.  An ETF is a penalty charged when a service contract is canceled before its agreed upon term is completed.  As all of the lines in question had already expired, GPSI disputed the ETF charges, with no resolution.

55.    GPSI, through Mr. Ruperto, continued to dispute the baseless ETF charges, but Verizon continued to apply them.  The fees were fraudulent, having no basis in the contract

between the parties, as the lines had exceeded their term, and did not make economic sense as the ETFs Verizon imposed for the now-obsolete and unsupported lines were far higher than it would have cost to keep the expired ghost lines active.

56.     Resolution remained elusive for several months, with Verizon support and upper management providing no satisfactory answers or any resolution of the false ETF issue.  Verizon avoided Mr. Ruperto's calls and avoided addressing the disputed charges.  While the charges remained on the bill, Mr. Ruperto was hopeful that Verizon would come to its senses and be reasonable, and that the issue would be resolved.

57.     At all relevant times, GPSI continued to make its monthly payments with Verizon, paying for all costs and fees based legitimately on the parties' contract, while protesting the unsupported and abusively high ETF charges.

**F.     2022-2023: Verizon Escalates GPSI's Account to Collections Department, Without Making any Good Faith Attempt to Resolve GPSI's Protests and "Tickets"**

58.     When payment of the false ETF charges was not made, GPSI's account was sent to Verizon collections department where Verizon threatened to shut down service to GPSI's account.

59.     GPSI received numerous emails from Verizon notifying GPSI that its account had been sent to Verizon's collection department.  Despite Verizon frustrating GPSI's ongoing efforts to resolve the ETF issues, GPSI still believed that all of the charges were due to a misunderstanding and that Verizon would ultimately resolve the issue with its long-standing customer.  The collections notifications were sent both through automated emails and direct communication from Verizon's collections agents**.**  GPSI protested the collections action, regularly communicating with collection agents in a good faith attempt to get Verizon to finally

address the issue.  However, despite GPSI's efforts to resolve the situation, Verizon continued to pursue the baseless ETF charges.

60.     Throughout Mr. Ruperto's discussions with Verizon collections department, he was advised to file "tickets" to dispute the baseless charges imposed by Verizon.  According to Verizon's own statements, policies and procedures, the effect of the tickets should have been to prevent the suspension of GPSI's wireless account while the disputed charges were investigated. Per Verizon's instructions, policies and procedures, Mr. Ruperto continued to file tickets to prevent Verizon from stopping service, while he persisted in his time-consuming and frustrating attempts to obtain a definitive response from Verizon's representatives.

61.     By September of 2022, Verizon had applied $30,544.45 in ETF charges to GPSI's account. GPSI's September invoice stated GPSI had until October 15, 2022 to pay the amount.

**G.     2022-Present: Verizon Cuts off Services to GPSI's Lines — Despite the Ongoing Discussions and Before Verizon's Own "Deadline" — Effectively Destroying GPSI's Business and Causing Massive Financial Harm**

62.     In or around October 3, 2022, Catherine Bennett, a supervisor in the collections department of Verizon Business Group, contacted Mr. Ruperto to discuss the past due balance of the account.  Bennett stated that service interruption was scheduled for October 7, 2022.  To avoid the service interruption, Verizon demanded that GPSI pay $12,500.00 by no later than October 5, 2022 and an additional $12,435.26 no later than October 12, 2022.

63.     Mr. Ruperto advised Bennett that, per Verizon's own instructions, policies and procedures, he was waiting on a response from Verizon's management regarding the baseless ETF charges.  Bennett responded that the service interruption date was firm and advised Mr. Ruperto to focus on preparing for the service interruption that would result if GPSI did not pay

the ETF charges.  Bennett told Mr. Ruperto that GPSI had until October 4, 2022 (just one day after Bennett's October 3, 2022 communication) to accept the payment arrangement.

64.     On October 4, 2022, Bennett stated that the suspension would proceed on October 7 and told Mr. Ruperto to make alternative arrangements for his accounts.

65.     Mr. Ruperto reached out to his account liaison at Verizon regarding the response of Verizon management to the ETF charges.  He also requested to deal with someone other than Bennett, as she was so contentious, and/or provide additional time to figure out how to pay the amount demanded by Bennett.

66.     On October 5, 2022, Bennett sent another email to GPSI stating it must pay the full balance by October 7, 2022.  Bennett, intending to force payment, further stated she was the final decision maker and that no further extensions would be permitted.

67.     GPSI filed a ticket to postpone the suspension date and sent it to Bennett.  Mr. Ruperto further advised that GPSI was getting the funds together to pay the demanded amount.

68.     On October 7, 2022, Mr. Ruperto emailed Bennett requesting that late fees and penalties be removed from GPSI's account, as GPSI had been protesting the baseless charges in good faith so they should not be deemed "late."

69.     In response, Bennett told Mr. Ruperto to contact customer service and attached the September invoice.  Importantly, this invoice stated the deadline to pay was October 15, 2022.

70.     With complete disregard of Verizon's own "deadline" of October 15, 2022, Bennett demanded that GPSI make payment by the morning of October 7, 2022.  As GPSI had pending tickets, suspension of GPSI's account should have been prevented, according to Verizon's own statements, policies and procedures.

71.     On October 12, 2022, three days *before* Verizon's own self-proclaimed deadline, and without first warning to GPSI, Verizon abruptly shut off all of GPSI's lines, rendering GPSI's devices non-operational.  The disconnection caused major disruptions to GPSI's business and to the operations of GPSI customers, including such vital operations as school bus tracking, law enforcement conducting live investigations, pharmaceuticals in transit and medical donated organ tracking operations.  These businesses and public entities relied on GPSI's devices to function and were left without connectivity for an entire half-day.

72.     GPSI's account was suspended despite GPSI having 2 tickets which were supposed to prevent any such suspension, and despite Verizon's own invoice stating that GPSI had until October 15, 2022 to pay the amount demanded by Verizon.

73.     Upon learning of the abrupt suspension of service, Mr. Ruperto immediately contacted Bennett.  When asked the reason for the suspension, Bennett told Plaintiff no payment was made so the lines were suspended.  When confronted about the tickets, Bennett failed to address them and unilaterally proclaimed that payment of the full balance purportedly due was required immediately to reconnect the account, and that negotiations were over.

74.     Faced with this business emergency created by Bennett and Verizon, the fraudulent fees and violations of Verizon's own statements, policies and procedures, GPSI paid the full purported balance $30,644.45 on October 12, 2022 to get the lines reconnected and restore service to GPSI's customers.

75.     The lines were reconnected, but already damage had been done to GPSI's business and its previously outstanding reputation among its customers and throughout the Integrated Wireless Tracking industry, which GPSI had pioneered years earlier.

76.     The following month, Verizon's invoice contained "Surcharges" of $82,643.73. Verizon informed GPSI that this charge was a "reconnect fee" for each line Verizon had improperly disconnected.  GPSI was blindsided by this fraudulent fee, a flagrant violation of the parties' contract, which made no provision for such reconnect fees.  GPSI immediately began calling Verizon for support.  Despite assurances that the improper "reconnect fee" would be removed, support teams indicated that approval from upper management was required due to the significant amount of the fee.  GPSI engaged with Verizon on a daily basis, but Verizon was in no hurry to resolve the issue.  Instead, Verizon continued to "stonewall" GPSI, Verizon's loyal longtime customer and business partner.

77.     Based on Verizon's previous conduct, GPSI knew that Verizon was likely going to suspend GPSI account if the fraudulent $82,643.73 "reconnect fee" was not paid. As such, GPSI attempted to mitigate the damage to its customers by transferring its customers' lines to another company that received wireless services from Verizon.  This would at least avoid an interruption of service to GPSI customers.  Before the lines could be transferred, Verizon had to approve the transaction.

78.     Verizon wanted "its" money and so, it refused the request to transfer the lines to the other company.  In January of 2023, Verizon demanded that GPSI pay the fraudulent "reconnect fees" or Verizon would, once again, disconnect all of GPSI's lines.

79.     Due in large part to GPSI's reluctant payment of the false ETF charges made to keep its business afloat, GPSI was unable to pay Verizon's fraudulent $82,643.73 "reconnect fee."  In or around February 2023, Verizon responded by shutting off all of GPSI's lines, resulting in a complete loss of wireless tracking services to GPSI's customers.

80.    Faced with this critical situation, GPSI had no choice but to immediately reach out to its customers and assist them in transitioning to alternative providers.  This marked the end of an era for GPSI as it was forced to shut down its business operations after battling for many months against Verizon's management and Defendants' fraudulent, baseless fees and charges.

81.    Even after Verizon destroyed GPSI's business operations — and therefore was no longer providing any services to GPSI — it continued to increase the fraudulent charges to GPSI. The amount purportedly due from GPSI rapidly snowballed.

82.    Subsequently, Verizon continued to demand payment for the "reconnect fee" and also piled on additional baseless fees and charges.  To summarize:

- The original fee dispute arose because Verizon fabricated improper ETF charges for lines that had indisputably already expired and therefore, Verizon was contractually prohibited from assessing such charges against GPSI;

- When GPSI continued to dispute the false ETF charges in good faith, Verizon suspended all of GPSI's lines, forcing GPSI to pay for the false ETF charges just to get its lines reconnected and keep its business afloat;

- After coercing GPSI into making payment for the false ETF charges, in November 2022, Verizon levied a baseless $82,643.73 "reconnect fee" which ultimately forced GPSI out of business in or around February 2023;

- In the 5-month period from November 2022 to April 2023, Verizon inflated, without explanation or any basis in the parties' contract, the purported amount owed from $82,643.73 to $218,528.12, an increase of over 164%; and

- In the 4-month period from April 2023 to August 2023, again without explanation or any basis in the parties' contract, Verizon further increased the alleged amount owed from $218,528.12 to $600,054.27, a further increase of over 175%.

## FIRST CAUSE OF ACTION
### Breach of Contract
### (As Against All Defendants)

83.    Paragraphs 1 through 82 are repeated and re-alleged as if fully set forth herein.

84.    Under the contract between Plaintiff and Defendants, Defendants agreed to provide service to M2M lines which would be used by Plaintiff.  In exchange, Plaintiff agreed to pay for service/usage provided by Defendant.  The term for each M2M line was a period of one or two years.  Thereafter, service continued on a month-to-month basis.  If the M2M line was terminated before the term expired, an Early Termination Fee ("ETF") of $50.00 would be applied.  If the M2M line was terminated after the term expired (*i.e.*, in the month-to-month phase), no ETF fee could be applied.

85.    Plaintiff complied with all requisite terms and conditions required of it under the contract, or has been excused from such performance, due to Defendants' breaches of the contract as alleged herein.

86.    In 2019, Defendants chose to terminate service to the M2M lines with CDMA technology.  As such, Plaintiff was forced to replace all of the CDMA devices, which Verizon would no longer support, with newer LTE devices.  When Plaintiff deactivated the unsupported 3-5 year old lines, all of whose 1-2 year terms had expired, Defendants improperly charged Plaintiff ETFs on each of the old, expired lines.  When Plaintiff disputed the baseless ETF charges, Defendant shut down service to all of Plaintiff's lines.  As a direct consequence, all of Plaintiff's customers were left without service.

87.    Defendants and Does 1 through 25 breached the contractual obligations they had with Plaintiff by failing to comply with the terms of the agreement when they unreasonably and wrongfully terminated service to all of Plaintiff's wireless lines, although Plaintiff had continued to pay for service and duly performed all conditions required of it.

88.    Defendants and Does 1 through 25, breached their duties under the contract between the parties by, among other things, the following actions:

(a)    Failing to comply with the terms of the agreement when it unreasonably and wrongfully terminated service to the wireless lines;

(b)    Wrongfully charging Early Termination Fees to Plaintiff;

(c)    Arbitrarily and wrongfully suspending Plaintiff's account;

(d)    Wrongfully charging a baseless "reconnect fee";

(e)    Abusing its power by forcing an unauthorized payment in order to maintain essential services to Plaintiff's customers;

(f)    Abusing its power by arbitrarily shutting off service; and

(g)    Other acts and omissions of which Plaintiff is presently unaware, but which will be proved at time of trial.

89.    Defendant breached its contractual obligations and is liable to Plaintiff for all detriment and damages proximately caused by such breach, in an amount to be proven at the time of trial.  Defendant knew or should have known Plaintiff's business was entirely dependent on Defendant's service.  Defendant knew or should have known that by shutting off service, Plaintiff would sustain damages.

90.    Specifically and as a proximate result of Defendants' breaches of contract, Plaintiff has suffered, and continues to suffer, financial damage and hardship, pre-judgment

interest, and attorney's fees due to the Defendants' actions in an amount to be proven at the time of trial.

91.     The aforementioned conduct was intentionally done with callous and conscience disregard for the rights of Plaintiff, and were willful, malicious and oppressive, and designed to injure Plaintiff.  Such conduct was done by Defendants and with the prior knowledge, consent or subsequent ratification by an officer, director or managing agent of Defendants.  Therefore, Plaintiff is entitled to punitive and exemplary damages in an amount sufficient to punish Defendants and DOES 1 through 25, for their wrongdoing, and to deter similar conduct in the future.

## SECOND CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (As Against All Defendants)

92.     Paragraphs 1 through 91 are repeated and re-alleged as if fully set forth herein.

93.     Under the contract between Plaintiff and Defendants, Defendants agreed to provide service to wireless lines and Plaintiff agreed to pay for usage.  Implied in the contract was a covenant of good faith and fair dealing, pursuant to which, among other things, Defendants were required to give the interests of Plaintiff equal consideration with its own interests, and to deal fairly, in good faith, and openly with Plaintiff.

94.     Furthermore, Defendants were not to withhold or deny the benefits for which Plaintiff had contracted.  Plaintiff relied upon the contract and the covenants implied therein to continue providing services to its customers.

95.     As recited in detail herein, Plaintiff was wrongfully charged ETFs. Plaintiff disputed the charges in good faith.  In spite of repeated requests to Defendants' representatives, Defendants refused to remove the wrongful charges.

96.     When Plaintiff did not pay the disputed charges, Plaintiff's account was sent to Defendants' collection department.  Plaintiff attempted to reason with Defendants, but Defendants unreasonably refused to negotiate.  Instead, Defendants threatened to shut down service to Plaintiff's account, denying Plaintiff the primary benefit of the contract.  Given the prior partnership and longstanding relationship between Plaintiff and Defendants, Defendants knew service was essential to Plaintiff's business and customers.  Knowing this, Defendants intentionally shut off service to Plaintiff's account to force Plaintiff to pay the charges.

97.     Not only did Defendants shut off service prior to the deadline for payment and without warning, but Defendants blatantly disregarded their own statements, policies and procedures regarding the "tickets" which were supposed to prevent the suspension of Plaintiff's account and the ensure the continuance of the wireless services that were essential to Plaintiff's customers and to the survival of Plaintiff's entire business.

98.     After Defendants cut off wireless services to Plaintiff and its customers, Plaintiff was forced to pay the improper charges in order to restore service.  Within a day, Defendants turned service to the account back on, though substantial damage had already been done.

99.     Defendants then, unreasonably and without proper cause or any basis in the parties contract, charged a "reconnect fee" on all of Plaintiff's lines, amounting to $82,643.73.

100.    When Plaintiff was unable to pay the amount improperly demanded by Defendants, Defendants threatened to suspend service to the account again, knowing this would massively disrupt the relationship between Plaintiff and its customers and cause massive harm to Plaintiff's business.

101.    Plaintiff attempted to mitigate the damage to its customers by transferring its customers' lines to another company already with Verizon.  This would avoid an interruption of service to Plaintiff's customers.  Defendants had to approve the proposed transfer.

102.    Without prior payment of the $82,643.73 "reconnection fee", Defendants denied the transfer of customers.  Defendants abused their position and failed to deal fairly and in good faith with Plaintiff when they failed to approve Plaintiff's reasonable request.

103.    In January of 2023, Defendants suspended Plaintiffs account and terminated service to Plaintiff's lines. Plaintiff's account was never reconnected, and Plaintiff's business was destroyed by the loss of the wireless services that were essential to Plaintiff's operations.

104.    Defendants breached their duty of good faith and fair dealing by, among other things, the following actions:

(a)    Failing to comply with the terms of the agreement when it unreasonably and wrongfully terminated service to the wireless lines;

(b)    Wrongfully charging Early Termination Fees to Plaintiff;

(c)    Arbitrarily and wrongfully suspending Plaintiff's account;

(d)    Wrongfully charging a baseless "reconnect fee";

(e)    Abusing its power by forcing unauthorized payment in order to maintain essential services to Plaintiff's customers;

(f)    Abusing its power by arbitrarily shutting off service;

(g)    Placing Defendants' own economic interests over and above those of Plaintiff;

(h)    Failing to conduct a reasonable investigation;

(i)    Failing to promptly respond to Plaintiff and refusing to communicate;

(j)    Failing to deal fairly and negotiate in good faith; and

(k)    Other acts and omissions of which Plaintiff is presently unaware, but which will be proved at time of trial.

105.    Defendants, and each of them, engaged in despicable conduct, including charging unjust fees and threatening suspension of Plaintiff's service, improper and inadequate investigation of Plaintiff's disputed charges, placing Defendants own economic interests over and above Plaintiff, forcing Plaintiff to pay unauthorized charges by shutting down service to Plaintiff's lines, refusing an arrangement that would prevent disruption of service to Plaintiff's customers, suspending service of Plaintiff's account, again, for failure to pay unwarranted, excessive fees.  This conduct was deliberate, calculated and intentional, and done in the conscience disregard of the Plaintiff's rights, and with an aim towards protecting Defendant's economic interest at the expense of Plaintiff's interest.

106.    Defendants breached the covenant of good faith and fair dealing arising from the above-referenced contract and is liable to Plaintiff for all detriment and damages proximately caused by such breach in an amount to be proven at trial.

107.    The above-referenced breaches of the implied covenant of good faith and fair dealing were intentionally done with callous and conscience disregard for the rights of Plaintiff, and were willful, malicious and oppressive, and designed to injure Plaintiff.  Such conduct was done as a course of business conduct by Defendants and with the prior knowledge, consent or subsequent ratification by an officer, director or managing agent of Defendants.

108.    Therefore, Plaintiff is entitled to punitive and exemplary damages in an amount sufficient to punish Defendants and Does 1 through 25, for their wrongdoing, and to deter similar conduct in the future.

**THIRD CAUSE OF ACTION**
**Tortious Interference with Contract**
**(As Against All Defendants)**

109.    Paragraphs 1 through 108 are repeated and re-alleged as if fully set forth herein.

110.    Prior to Defendants' actions, Plaintiff enjoyed a robust and profitable business. GPSI enjoyed longstanding contractual relationships with its customers.

111.    Defendants were aware of Plaintiff's customer base and contractual relationships due to the longstanding business relationship between Plaintiff and Defendants, including a multi-year joint marketing partnership.

112.    Further, Defendants knew that Plaintiff was entirely dependent on Defendants' delivery of continuous, or nearly continuous, wireless services in order to maintain necessary wireless tracking services to Plaintiff's customers.

113.    Defendants deliberately shut off service with the sole purpose of interfering with Plaintiff's ability to perform its contractual obligations to its customers.  Without service to Plaintiff's accounts, Plaintiff was not able to provide wireless tracking services to its customers. As a result, Defendants' actions interfered with numerous contractual relationships between Plaintiff and its customers, including by causing breaches in the contracts between Plaintiff and its customers.

114.    Defendants' acts were intentional and without justification or excuse.

115.    As a direct, proximate and consequential result of the aforementioned, Plaintiff lost the majority of its clients, suffered monetary damages, plus pre-judgment interest and attorneys' fees, according to proof in the event of trial.

116.    The aforementioned conduct was intentionally done with callous and conscience disregard for the rights of Plaintiff, and were willful, malicious and oppressive, and designed to

injure Plaintiff.  Such conduct was done by Defendants and with the prior knowledge, consent or

subsequent ratification by an officer, director or managing agent of Defendants.

117.    Therefore, Plaintiff is entitled to punitive and exemplary damages in an amount

sufficient to punish Defendants and DOES 1 through 25, for their wrongdoing, and to deter

similar conduct in the future.

## FOURTH CAUSE OF ACTION
### Tortious Interference with Prospective Business Relationships
### (As Against All Defendants)

118.    Paragraphs 1 through 117 are repeated and re-alleged as if fully set forth herein.

119.    Prior to Defendants' interference, Plaintiff had business relationships spanning

years, often a decade or more.  Plaintiff reasonably expected these contractual relationships to

continue and be renewed periodically.  As Plaintiff's business and its reputation grew, Plaintiff

also reasonably expected to develop new, profitable business relationships with additional

customers.

120.    Defendants were aware of Plaintiff's customer base and contractual relationships,

as well as their prospective business relationships.  Plaintiff was in Defendant's partner program

for several years.  Defendants learned of all the potential customers of Plaintiff during their

marketing relationship.  Because the demand for wireless solutions is constant and growing in

many market segments, there is an endless flow of potential new customers customers.

121.    Further, Defendants knew that Plaintiff was entirely dependent on Defendants for

service to Plaintiff's customer base.

122.    During the mandatory transition from CDMA hardware to LTE hardware,

Defendants improperly and illegally charged Early Termination Fees ("ETFs") to Plaintiff.  With

the intent of forcing Plaintiff to pay the unjustified charges, Defendants threatened suspension of

Plaintiff's account knowing that it was certain or substantially certain to cause disruption of Plaintiff's ability to perform its obligations to its customers without Defendant's service. When Plaintiff continued to dispute the charges, Defendants deliberately shut off service prior to the deadline date set by Defendant's invoice and in complete disregard of the "tickets" that were pending, a violation of Defendants' own statements, policies and procedures regarding dispute resolutions with its customers.

123.    Defendants used improper means and acted with the sole purpose of disrupting Plaintiff's current business relationships and prospective relationships when it improperly suspended Plaintiff's account.

124.    Defendants willful and oppressive suspension of Plaintiff's account prevented Plaintiff from providing wireless service to his customers, which directly interfered with numerous contractual and prospective contractual relationships between Plaintiff and its customers and prospective customers. Plaintiff was forced to pay the unjustified charges to Defendants in order to reconnect service.

125.    Defendants continued to improperly interfere with Plaintiff's current and prospective business relationships when Defendant wrongfully applied additional penalties for reconnecting service to Plaintiff's lines.

126.    Defendants relentlessly threatened to shut off service to Plaintiff knowing it would interfere with Plaintiff's customers and current and prospective business relationships. When Plaintiff could not pay the penalty amount, the account was suspended again, and customers were permanently deprived of Plaintiff's services, destroying numerous current and prospective business relationships.

127.    Defendants' illegal and intentional interference caused Plaintiff's customers to leave Plaintiff.  As a result, Plaintiff sustained significant monetary damages when its customers did not continue the business relationship.

128.    Defendants wrongfully interfered with Plaintiff's current and prospective business relations when it applied unjustified penalties and fees and charges, not once but multiple times, which ultimately caused Plaintiff to close its accounts.

129.    Defendants' acts were intentional and without justification or excuse.

130.    As a direct, proximate and consequential result of the aforementioned misconduct by Defendants, Plaintiff lost the majority of its customers and prospective customers, suffered monetary damages, plus pre-judgment interest and attorneys' fees, according to proof in the event of trial.

131.    The aforementioned conduct was intentionally done with callous and conscience disregard for the rights of Plaintiff, and were willful, malicious and oppressive, and designed to injure Plaintiff.  Such conduct was done by Defendants and with the prior knowledge, consent or subsequent ratification by an officer, director or managing agent of Defendants.  Therefore, Plaintiff is entitled to punitive and exemplary damages in an amount sufficient to punish Defendants and Does 1 through 25, for their wrongdoing, and to deter similar conduct in the future.

**FIFTH CAUSE OF ACTION**
**Fraudulent Inducement**
**(As Against All Defendants)**

132.    Paragraphs 1 through 131 are repeated and re-alleged as if fully set forth herein.

133.    As recited herein, Defendants made numerous misrepresentations and/or omissions of material fact, including but not limited to the following:

(a)     Defendants intentionally and falsely represented that Plaintiff incurred thousands of dollars in Early Termination Fees (the "ETFs") with the knowledge that the ETF charges were improper as all lines had exceeded the contractual term and were month to month;

(b)     Defendants intentionally and falsely represented that the deadline for payment of the ETF charges was October 15, 2022, knowing that the account would be suspended prior to that date;

(c)     Defendants intentionally and falsely represented that the improper ETF charges would be removed and/or refunded after payment with the knowledge that no such removal or refund would be made;

(d)     Defendants intentionally and falsely represented that submitting the "tickets" would prevent suspension of Plaintiff's account; and

(e)     Other acts and omissions of which Plaintiff is presently unaware, but which will be proved at time of trial.

134.    Defendants made these misrepresentations with the intention of inducing reliance, suspending Plaintiff's account and obtaining payment from Plaintiff for the improper ETF charges.  Defendants further intended to suspend the account prior to October 15, 2022 knowing that Plaintiff would be forced to make payment and knowing that afterward, Defendants would charge an outrageously large reconnect fee.

135.    Because of Plaintiff's longstanding relationship with Defendants, Plaintiff justifiably relied on these misrepresentations when 1) Plaintiff filed the tickets to prevent suspension of the account; 2) Plaintiff relied on Defendants invoice which stated the deadline for payment was 10/15/22 and so, Plaintiff did not pay the ETF charges prior to invoiced date of 10/15/22; and 3) Plaintiff ultimately paid the ETF charges.

136.    As a direct result of the misrepresentations, Plaintiff sustained damages in the amount of $30,644.45 for payment of the ETF charges.  Plaintiff has further incurred damages in the amount of $82,643.73 for the alleged reconnect fees which has increased to an astounding $600,054.27.

137.    As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiff has suffered and continues to suffer significant harm, including loss of business and profits.

138.    The aforementioned conduct was intentionally done with callous and conscience disregard for the rights of Plaintiff, and were willful, malicious and oppressive, and designed to injure Plaintiff.  Such conduct was done by Defendants and with the prior knowledge, consent or subsequent ratification by an officer, director or managing agent of Defendants.  Therefore, Plaintiff is entitled to punitive and exemplary damages in an amount sufficient to punish Defendants and DOES 1 through 25, for their wrongdoing, and to deter similar conduct in the future.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation
### (As Against All Defendants)

139.    Paragraphs 1 through 138 are repeated and re-alleged as if fully set forth herein.

140.    As a result of the longstanding business and contractual relationship between the parties, Defendants had a special relationship with Plaintiff and a duty to give correct information to Plaintiff in the course of their business dealings.

141.    As recited herein, Defendants made numerous misrepresentations and/or omissions of material fact, including but not limited to the following:

(a)    Defendants knew or should have known that they falsely represented to Plaintiff that Plaintiff incurred thousands of dollars in Early Termination Fees (the "ETFs") with the knowledge that the ETF charges were improper as all lines had exceeded the contractual term and were month to month;

(b)    Defendants knew or should have known that they falsely represented that the deadline for payment of the ETF charges was October 15, 2022, knowing that the account would be suspended prior to that date;

(c)    Defendants knew or should have known that they falsely represented that the improper ETF charges would be removed and/or refunded after payment with the knowledge that no such removal or refund would be made;

(d)    Defendants knew or should have known that they falsely represented that submitting the "tickets" would prevent suspension of Plaintiff's account; and

(e)    Other acts and omissions of which Plaintiff is presently unaware, but which will be proved at time of trial.

142.    Defendants knew or should have known that Plaintiff would rely on these misrepresentations due to their longstanding business relationship.

143.     The information included in Defendants' false representations was known by Defendants to be desired and used by Plaintiff to be used for serious purposes, for example the purpose of understanding the actual amounts Plaintiff contractually owed to Defendants, and the purpose of maintaining the wireless lines that were essential to Plaintiff's continued business operations.

144.     Plaintiff justifiably relied on these misrepresentations when 1) Plaintiff filed the tickets to prevent suspension of the account; 2) Plaintiff relied on Defendants invoice which stated the deadline for payment was 10/15/22 and so, Plaintiff did not pay the ETF charges prior to invoiced date of 10/15/22; and 3) Plaintiff ultimately paid the ETF charges.

145.     As a direct result of the misrepresentations, Plaintiff sustained damages in the amount of $30,644.45 for payment of the ETF charges.  Plaintiff has further incurred damages in the amount of $82,643.73 for the alleged reconnect fees which has increased to an astounding $600,054.27.

146.     As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiff has suffered and continues to suffer significant harm, including loss of business and profits.

147.     The aforementioned conduct was intentionally done with callous and conscience disregard for the rights of Plaintiff, and were willful, malicious and oppressive, and designed to injure Plaintiff.  Such conduct was done by Defendants and with the prior knowledge, consent or subsequent ratification by an officer, director or managing agent of Defendants.  Therefore, Plaintiff is entitled to punitive and exemplary damages in an amount sufficient to punish Defendants and DOES 1 through 25, for their wrongdoing, and to deter similar conduct in the future.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment
### (As Against All Defendants)

148.    Paragraphs 1 through 147 are repeated and re-alleged as if fully set forth herein.

149.    As a result of the misconduct recited herein, Defendants were enriched, including through the ETFs, Surcharges and Fees they wrongfully imposed on Plaintiff.

150.    On information and belief, Defendants were further enriched by the elimination of a competitor, Plaintiff, which had pioneered the field of Integrated Wireless Tracking years before.

151.    Defendants' enrichment was at Plaintiff's expense, as Plaintiff was first forced to pay baseless and improper charges to keep its business afloat and, later, was effectively destroyed as a business entity due to Defendants' permanent cancellation of its wireless services to Plaintiff

152.    As a direct and proximate result of Defendants' unjust enrichment, including without limitation the baseless ETFs, Surcharges and Fees, Plaintiff has suffered and continues to suffer significant harm, including loss of business and profits.

153.    Plaintiff is entitled to compensatory and, because of the willful and malicious nature of Defendants' acts, punitive damages in an amount to be determined at trial.

154.    The aforementioned conduct was intentionally done with callous and conscience disregard for the rights of Plaintiff, and were willful, malicious and oppressive, and designed to injure Plaintiff.  Such conduct was done by Defendants and with the prior knowledge, consent or subsequent ratification by an officer, director or managing agent of Defendants.  Therefore, Plaintiff is entitled to punitive and exemplary damages in an amount sufficient to punish Defendants and DOES 1 through 25, for their wrongdoing, and to deter similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff GPS International Technologies, Inc. ("GPSI") respectfully requests that the Court:

A.    Enter judgment in favor of Plaintiff GPSI on all claims for relief;

B.    Award Plaintiff GPSI damages to be determined at trial;

C.    Grant Plaintiff GPSI a permanent injunction, enjoining Defendants from further misconduct and enjoining Defendants to take affirmative actions to ameliorate Defendants' prior and ongoing misconduct;

E.    Award Plaintiff GPSI its costs and reasonable attorneys' fees;

F.    Award Plaintiff GPSI punitive damages according to proof; and

G.    In accordance with Fed. R. Civ. P. 54(c)(4), award Plaintiff GPSI the relief to which it is entitled, even if not demanded in its pleadings, and such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff GPS International Technologies, Inc. hereby demands a trial by jury for all issues so triable in this case.


Dated:  October 11, 2024                    Respectfully submitted,

                                            PRACTUS, LLP

                                            Christopher A. Colvin
                                            543 E. 17th Street
                                            Brooklyn, NY 11226
                                            Phone:  (917) 722-8601
                                            chris.colvin@practus.com

                                            *Attorneys for Plaintiff*
                                            GPS International Technologies, Inc.